Whitaker, Judge,
delivered the opinion of the court:
Plaintiff, a construction contractor, brings this suit to recover $68,028.03, a sum it says it lost in constructing a hospital for the Veterans’ Administration. In 1941, it was awarded a, contract to build a reinforced concrete hospital building at Fort Howard, Maryland, for a price of $871,700. It began work on August 22 of that year. The building was to have been completed within 400 calendar days after receipt of notice to proceed on August 12,1941, i.e., by September 16, 1942. In actuality, however, completion was delayed for 429 additional days, and the hospital was not accepted until November 19,1943.
The intervention of a World War was the primary cause of most of the delay. Beginning in the early part of 1942, the Office of Production Management, in order to facilitate *385 production under armaments contracts,[1] issued a number of priority orders that diverted certain scarce building materials from this project and either forbade or limited their use. These orders prevented plaintiff from using building materials such as steel, copper, brass, and aluminum as it had planned to do. Acting under the Changes article of the contract,[2] defendant required plaintiff to procure substitute materials, such as wood, cast iron, fabric and plastic, and to use them in place of those affected by priority orders.
Plaintiff’s case rests upon the argument that the cumulative effect of the various priority orders was to make performance of its obligations under the contract impossible. Plaintiff further contends that, in complying with the various change orders, it was compelled to construct a wholly different project from that called for under the original specifications. For this work, plaintiff says it is entitled to receive a fair price, equal to its costs in doing the worn.
The trial commissioner to whom this case was referred concluded that the onset of the war created chaotic conditions in the construction field generally and thoroughly disrupted the program for the completion of this particular *386 project. He also found that most of the delay stemmed from these chaotic conditions and was not the fault of either the plaintiff or the defendant, both of whom coped with the situation as best they could. Although each party complains of deficiencies on the part of the other, the evidence supports the commissioner’s findings in this respect. Defendant ultimately granted plaintiff extensions of time sufficient to cover the extra time necessary to finish the building and thereby waived any claim for liquidated damages.
When the work first got underway, plaintiff encountered delays in driving foundation piles and in pouring concrete, which exceeded two months in duration. These delays, which were unrelated to the issuance of priority orders, and for which defendant was not responsible, had a disruptive effect on the balance of the project; for, as time went along, the effects of military conscription coupled with the establishment of many defense plants in the area created a severe shortage of skilled labor and an increase in labor costs. The passage of time also brought an increasing number of priority orders, as more and more materials were allocated exclusively to war production.
Plaintiff had let the bulk of the subcontracts and had ordered most of the materials required by the specifications by the fall of 1941. As it was prohibited from using one or another type of building material, plaintiff had to ascertain from its various subcontractors and suppliers what substitutes were available and the extent to which the substitutions would increase or decrease its costs. Having obtained this information, plaintiff would then pass it along to the contracting officer, and he would — after determining that the substitute was acceptable and not barred by priority orders — approve the substitution and issue a change order authorizing the use of the new material in lieu of the one that was not available.
The contract price was then adjusted to reflect any cost changes resulting from the substitution. Plaintiff was generally allowed a 10 percent overhead fee and a 10 percent profit on the cost of materials. When the price was in *387 creased, the profit and overhead charges were recomputed to reflect the increased cost. When the cost of the substitute materials was less than the cost of those originally specified, however, no change was made in the original profit and overhead fees. The net effect of the various changes was to decrease the contract price by $9,372.28.
Plaintiff accepted all the change orders, including those increasing or decreasing the contract price, without protest.
However, on one occasion, in November 1941, plaintiff complained to the Veterans’ Administration’s Director of Construction about the increase in its overhead costs arising from the need to obtain the information necessary to substitute materials (often through many tiers of subcontractors and suppliers) and the haphazard fashion in which approval for the changes was given. But plaintiff never exercised its right under the contract to contest the amount of the price adjustments through administrative channels.[3]
Our jurisdiction over this case is founded upon a private law, the text of which is fully set out in finding number 2. That Act extends the statute of limitations on the commencement of this suit, but we construe it in all other respects as authorizing us to determine this case by the same procedure and by the application of the same substantive rules of law as apply generally to any contract action brought under 28 U.S.C. § 1491. The parties have not confined their arguments to the issue of plaintiff’s entitlement to a judgment under those substantive rules. They have also j oined issue on plaintiff’s contention that it may obtain recovery by way of a gratuity arising by virtue of some moral claim it may have on the conscience of the nation. Even if we assume, ar-guendo, that we might be given jurisdiction over such a claim, we do not think that the statute which conferred jurisdiction over this litigation grants us the power to adju- *388 dicat© such, a claim.[4] With the exception of the extension of the limitations period in plaintiff’s favor, we interpret it as placing plaintiff in no better position than any other litigant before the 'bar. Accordingly, we do not think that defendant can be held to any liability except such as flows from its acts and defaults as a party to a contract with the plaintiff.
As a consequence, any liability that attaches to the defendant must result from its acts or omissions in its purely contractual capacity and cannot be culled from its general and public acts as a sovereign. See Horowitz v. United States, 267 U.S. 458 (1925). Therefore, defendant does not incur any liability by reason of the issuance of priority orders that forbade the use of certain materials called for in the specifications. It issued those orders for the purpose of mobilizing the economy for war. In Gothwaite v. United States, 102 Ct. Cl. 400, 401 (1944), a case dealing with the same construction project that is here involved, we held that the issuance of priority orders was
an Act of a general and public character affecting all persons situated similarly to plaintiff. It authorized the exercise of sovereign powers in the defense of the nation. That the Government is not liable for such acts needs no argument. We have so held from the creation of this court. Deming v. United States, 1 C. Cls. 190; Jones v. United States, 1 C. Cls. 383; Wilson v. United States, 11 C. Cls. 513; Horowitz v. United States, 58 C. Cls. 189.
Kecognizing that it cannot use the issuance of priority orders as a basis for a cause of action, plaintiff has tried a different tack: it argues that those orders made performance impossible. The doctrine of impossibility of performance may, in an appropriate case, serve as a defense to an action *389 for non-performance of a contract, and it may arise as a result of governmental acts which place a commercially unsupportable burden on the promisee. See Williston, contracts §1938 (Bev. ed. 1938). The difficulty with plaintiff’s position, however, is that it is not seeking to use the doctrine in this fashion. It in fact performed its part of the bargain. It built the hospital in spite of priority orders.
Plaintiff contends, however, that the building it constructed was an entirely different project than the one called for in the original plans and specifications. It says that it completed this project under the compulsion of change orders outside the scope of the Changes article that were backed by the threat of criminal sanctions for failure to comply with the change orders. The only criminal statute to which plaintiff has referred us, and we know of no others, is section 301 of the Second War Powers Act, 56 Stat. 176, 179 (1942), which provides penalties for violations of priority orders. There is nothing in this provision that prevented plaintiff from refusing to complete performance of the contract if, as it says, such performance became impossible on account of priority orders. Certainly, it could not have used materials prohibited by such orders. But there was no statutory compulsion requiring it to locate and to utilize substitute materials if it did not feel contractually bound to do so.
During the time when plaintiff was performing the contract, defendant’s contracting officer issued a total of 65 formal change orders and ordered 37 changes which were denominated “minor modifications.” Thirty-five of the change orders and one minor modification dealt with and authorized the substitution of materials. The trial commissioner found that, each time a priority order eliminated or limited the use of a particular building material, both parties acted with reasonable promptness in locating an acceptable substitute and authorizing its use through a change in the specifications. Thus, we are not faced with a situation in which the defendant has unduly delayed in issuing a change order after the necessity for the change became evident. Cf. Anthony P. Miller, Inc. v. United States, 111 Ct. Cl. 252, *390 77 F. Supp. 209 (1948); F. H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 130 F. Supp. 394 (1955).
Article 3 of the contract gave the contracting officer the power to make changes in the specifications of the contract “within the scope thereof.” Under that article, the contractor was bound to comply with proper orders of the contracting officer changing the work. It was to be compensated by an equitable adjustment of the contract price. Such adjustments reflected the differences in cost of making the changes, as was done in this case. Since the right to make changes was reserved to the defendant, it cannot be liable for its exercise of that right, unless the changes were cardinal changes and exceeded the discretion which the Changes article vested in the contracting officer. See F. H. McGraw & Co. v. United States, supra; General Contracting Co. v. United States, 84 Ct. Cl. 570 (1937).
The sole question remaining before us, therefore, is whether the cumulative effect of the changes in materials necessitated by the priority orders caused a cardinal change beyond the permissible limits of the contracting officer’s discretion. In Saddler v. United States, 152 Ct. Cl. 557, 287 F. 2d 411 (1961), we said that there is no exact formula for determining when a change is unauthorized by the contract and is therefore a breach of it. Plaintiff points with particularity to the large number of changes that were ordered on this project. This factor is hardly determinative. In Magoba Construction Co. v. United States, 99 Ct. Cl. 662 (1943), we held that defendant did not abuse its discretionary right to issue change orders despite the fact that it issued a total of 62 of them in that case. Plaintiff also complains that the change orders altered the nature of the materials it had planned to use in constructing the hospital. But, as we pointed out in General Contracting Co. v. United States, supra, one of the primary purposes of a Changes article is to permit the contracting officer to order the substitution of one kind of building material for another.
In deciding whether a single change or a series of changes is a cardinal change and a breach of the contract, we must look to the work done in compliance with the change and *391 ascertain whether it was essentially the same work as the parties bargained for when the contract was awarded. Plaintiff has no right to complain if the project it ultimately constructed was essentially the same as the one it contracted to construct.
All of the changes that plaintiff was asked to make on this contract were interstitial in nature. For example, it substituted fabric-and-mastic waterproofing for copper flashing, wooden interior shelves for metal ones, and steel-and-enamel mirror frames for chromium ones. In contrast, the cases that have held the changes ordered by the contracting officer to be cardinal changes and, hence, not permitted under the contract, have involved changes that altered the nature of the thing to be constructed. Thus, in General Contracting Co. v. United States, supra, the illegal change order eliminated an entire building from the hospital complex that the plaintiff had contracted to build. And in Saddler v. United States, supra, the change orders purported to obligate the plaintiff to construct a much larger embankment, having almost twice the quantity of material, than it had contracted to build.
In this case, the changes did not materially alter the nature of the bargain into which plaintiff had entered or cause it to perform a different contract. Plaintiff contracted to build a reinforced concrete hospital building on a certain site at Fort Howard, Maryland, and that is exactly what it built. The hospital, when it was completed, was in the same location, looked the same, had the same number of rooms and floors and the same facilities as the one shown on the original plans and specifications. Apart from the substitution of materials, it differed not at all from the building that had been contemplated when the contract was awarded.
We therefore conclude that there was no cardinal change in the contract for which defendant is liable to the plaintiff. The changes that the contracting officer ordered and plaintiff performed were within the scope of the Changes article. Plaintiff has been fully compensated for making those changes by price adjustments. It is not entitled to any additional sum.
*392 Plaintiff has also pressed a claim on behalf of the Itandle-Kay Company, a partnership that was the plumbing subcontractor on the project. Randle-Kay has made a claim against plaintiff based upon financial losses allegedly resulting from delays in doing the plumbing work. The trial commissioner has found that this subcontractor encountered many delays, some of which were caused by priority orders, some of which were caused by plaintiff’s delays, and others that resulted from the shortage of skilled workmen in the area. However, the commissioner failed to find that any delay was the result of defendant’s failure to exercise due diligence in authorizing changes or in any other respect. Plaintiff has not excepted to the commissioner’s findings in this regard, nor has plaintiff disputed the accuracy of the commissioner’s finding that the evidence failed to substantiate any specific amount of damages arising out of priority orders or any other delay that it attributed to the defendant. Such proof is a prerequisite to recovery. See Laburnum Construction Corp. v. United States, 163 Ct. Cl. 339, 325 F. 2d 451.
For the foregoing reasons, plaintiff is not entitled to recover. Its petition will be dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Kobert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a New Jersey corporation chartered on January 3,1936, under the corporate name of Auf der Heide-Aragona, Inc. Its name was changed to Aragona Construction Company, Inc., on May 15,1953.
Its principal place of business was at 5510 Jackson Street, West New York, New Jersey, until about June 1959, when its address was changed to 5 Hillside Avenue, Tenafly, New Jersey. It was engaged in the construction of public and private buildings, from its organization in 1936 until 1955, when it discontinued active business.
*393 2. Private Law 85-770, 85th Congress, S. 552, approved September 2, 1958,72 Stat. A213 (which is referred to hereafter as “the jurisdictional act”), provides:
AN ACT
To confer jurisdiction upon the United States Court of Claims to hear, determine, and render judgment upon the claim of Auf der Heide-Aragona, Incorporated, of West New York, New Jersey.
Be it enacted, by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render judgment upon the claim of Auf der Heide-Aragona, Incorporated, of West New York, New Jersey, as to the liability of the United States, if any, either legal or equitable, for losses alleged to have been sustained by the said Auf der Heide-Aragona, Incorporated, of West New York, New Jersey, as the result of the performance of a contract numbered VAe-1185, dated July 25, 1941, entered into with the Veterans’ Administration.
Sec. 2. Notwithstanding any statute of limitations or lapse of time, suit upon such claim may be instituted by the claimant within one year after the date of enactment of this Act. Proceedings for the determination of such claim and review thereof, and payment of any judgment thereon, shall be had as in the case of claims over which such court has jurisdiction under section 1491 of title 28 of the United States Code.
Sec. 3. Nothing contained in this Act shall be construed as an inference of liability on the part of the United States Government.
3. (a) This suit was timely filed, pursuant to the jurisdictional act, to recover losses allegedly sustained in the performance of the contract mentioned in the jurisdictional act (referred to hereafter as “the contract”), which provided for the construction of a reinforced concrete hospital building at Fort Howard, Maryland. Plaintiff seeks $68,028.03 for itself, and $24,493.98 on behalf of subcontractors Joseph E. Randle and C. Robert Klueppelberg, doing business under the firm name of Randle-Kay Company.[5]
(b) Plaintiff claims these losses were sustained because of change orders and minor modifications that required substitution, for the materials specified in the contract, of other *394 materials, the procuring and use of which increased plaintiff’s costs, and that these changes occurred because of priority orders issued by the Government which prohibited the use of various materials originally specified in the contract. The plaintiff’s position is that, because of the priority orders, the original contract became impossible of performance and that the changes resulting from the priority orders had the effect of amendments or modifications of the contract whereby the defendant impliedly agreed to pay the reasonable costs and expenses, including overhead, which plaintiff incurred in performing the contract as so modified or amended.
(c) The amount of damages plaintiff claims is not an aggregate of specific items of added cost particularly attributable to the several change orders or minor modifications but is the aggregate difference between the amount received by the plaintiff under the contract and plaintiff’s costs according to a subsequent computation. Thus, the essence of plaintiff’s claim is that all of the loss it suffered on this contract is attributable to the changes induced by priorities.
Plaintiff also claims on behalf of its plumbing subcontractor, Kandle-Kay Company, damages for delay allegedly caused by priority orders. The amount claimed is computed by deducting Randle-Kay’s costs from the price it received; the resultant figure is the amount this subcontractor purportedly lost in performing its work on this project.
4. On June 28,1940, Congress passed an Act[6] which provided in part that the President might order that Navy and Army contracts or orders should have priority over other contracts. This Act was amended on May 31,1941,[7] to provide that the President might order that any contract or order or subcontract he deemed appropriate or necessary for the national defense should have priority over all other contracts or orders. The amending Act further provided that the President might allocate material in such manner and to such extent as he deemed necessary or appropriate in the public interest and to promote the national defense, and that no person, firm, or corporation should be held liable for *395 damages or penalties for any default under any contract or order which results directly or indirectly from bis compliance with any rule, regulation, or order issued under the amending Act.
5. The President delegated administration of the power granted under the statutes described in finding 4 to the Office of Production Management (referred to hereafter as “O.P.M.”).[8] On March 8, 1941, O.P.M. issued O.P.M. Regulation No. 3, “Defining the Status of the Division of Priorities in the Office of Production Management and Prescribing Its Duties and Functions,” 6 F.R. 1596. In April 1941, the Division of Priorities issued “Priorities and Defense, A Handbook on the Operation of the Priorities System.”
6. On April 30, 1941, plaintiff, received an invitation from the Veterans Administration (referred to hereafter as “the VA”) to bid on the contract. The invitation was accompanied by plans and specifications prepared by the VA. Plaintiff submitted its bid 57 days later, on June 26, 1941.
7. The proposed contract included the following provisions:
* * *
Ahticle 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties *396 fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
Article 4. Changed conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
Article 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
Sfc * * * *
Article 7. Materials and workmanship. — Unless otherwise specifically provided for in the specifications, all workmanship, equipment, materials, and articles incorporated in the work covered by this contract are to be of the best grade of their respective kinds for the purpose. Where equipment, materials, or articles are referred to in the specifications as “equal to” any particular standard, the contracting officer shall decide the question of equality. The contractor shall furnish to the contracting officer for his approval the name of the manufacturer of machinery, mechanical and other equipment which he contemplates incorporating in the work, together with their performance capacities and other pertinent information. When required by the specifications, or when called for by the contracting officer, the contractor shall furnish the contracting officer for approval full information concerning the materials or articles which he contemplates incorporating in the work. Samples of materials shall be submitted for *397 approval when so directed. Machinery, equipment, materials, and articles installed or used without such approval shall be at the risk of subsequent rejection. The contracting officer may require the contractor to dismiss from the work such employee as the contracting officer deems incompetent, careless, insubordinate, or otherwise objectionable.
Aeticle 8. Superintendence by contractor. — The contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the contracting officer, on the work at all times during progress, with authority to act for him.
Article 9. Delays — Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated aamages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, *398 floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
Article 10. Permits and care of work. — The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for the proper care and protection of all materials delivered and work performed until completion and final acceptance.
ij: >]i # #
Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed. *****
8. The General Conditions of the contract included the following provisions:
:fi ^ ‡ # ijs
2. CONTRACT:
>d <rt-« 2 CO Su? ^ <f p 3 -Í O OO H-fe y-j. Cl ® c+i-s 09 O ^ a CfQ 3 | CO CO co O H» ►d >d CM >-i CD o a á ^ CD o Pj |C *399 ber 9, 1940, Article 11(a) of U.S. Standard Form No. 23, tbe Standard Form Construction Contract has been revised to read as follows:
“ARticle 11. Eight-hour law — Overtime compensation — Convict labor. — (a) No laborer or mechanic doing any part of the work contemplated by this contract, in the employ of the contractor or any subcontractor contracting for any part of said work contemplated, shall be required or permitted to work more than eight hours in any one calendar day upon such work at the site thereof, except upon the condition that compensation is paid to such laborer or mechanic in accordance with the provisions of this article. The wages of every laborer and mechanic employed by the contractor or any subcontractor engaged in the performance of this contract shall be computed on a basic day rate of eight hours per day and work in excess of eight hours per day is permitted only upon the condition that every such laborer and mechanic shall be compensated for all hours worked in excess of eight hours per day at not less than one and one-half times the basic rate of pay. For each violation of the requirements of this article a penalty of five dollars shall be imposed upon the contractor for each laborer or mechanic for every calendar day in which such employee is required or permitted to labor more than eight hours upon said work without receiving compensation computed in accordance with this article, and all penalties thus imposed shall be withheld for the use and benefit of the Government: Provided, That this stipulation shall be subject in all respects to the exceptions and provisions of U.S. Code, title 40, sections 321, 324, 325, and 326, relating to hours of labor, as in part modified by the provisions of Section 303 of Public Act No. 781,76th Congress, approved September 9,1940, relating to compensation for overtime.”
3. EIGHTS RESERVED:
The Government reserves the following rights: * * * (d) To make any additions to, omissions from, changes in or substitutions for the work or materials or articles called for by the contract and without notice to the sureties on the bond, if any, guaranteeing the performance of the contract; * * *
*400 6. GOVERNMENT SUPERINTENDENCE:
A superintendent is to be detailed for the purpose of superintending the construction of this work, but such superintendency may not be continuous for the reason that he may also be employed upon other buildings, or he may be detailed for other purposes and his absence at any time is not to be considered as a reason for delay in carrying out the contract. The Veterans Administration shall have free access at all times to the work and shops for the purpose of making inspection and the contractor shall provide safe access to all parts of the work and shall cooperate and assist the representatives of the Veterans Administration in making such inspection. The superintendent’s directions shall be supplementary to the specification and not in conflict with the contract requirements. No claim for an extension of time or for additional compensation will be entertained by the Government except as provided for in the contract.
* * * $ $
10. SAMPLES AND MATERIAL LISTS:
(a) The contractor shall submit for approval samples of such materials to be used in the work as may be herein required. If schedule of samples required is furnished by the Veterans Administration, samples must be submitted in accordance therewith, and each sample shall be marked with the corresponding item number given on the schedule. No materials shall be used which do not equal the approved samples. Until such approval has been given, he must not incorporate in the work any materials or appliances to be so approved. The approval or acceptance of samples shall not preclude the rejection of any material upon the discovery of defects in same prior to the final acceptance of the completed work.
(b) In connection with the mechanical work of the project (plumbing, heating, electrical work, electric elevators, refrigerating equipment, etc.), the contractor shall submit a complete list of materials, as listed under the respective mechanical sections of the specifications, within 30 days after date of notice to proceed; no consideration will be given to partial lists submitted from time to time. In the event these requirements are not complied with, the Administrator reserves the right to select all materials and appliances, and such equipment must be installed without change in contract price.
*401 (h) The contractor will be held responsible for any delay in the progress of the work which may be due to his failure to observe these requirements, and the time for the completion of his contract will not be extended on account of his failure to submit samples in strict accordance with these requirements.
$ $ $ $ $
15. SCHEDULE OF PAYMENTS:
Within ten days after award of the contract, the contractor shall submit to the Veterans Administration in quadruplicate, through the superintendent, a schedule of the cost of the work prepared as follows: The schedule must show the cost of the main branches of the work, segregated by items under the headings listed on the monthly progress report form, for each of the separate units included in the award, so that the sum total of such items as applied to each unit will equal the cost of such unit and the sum total of the costs of all units will equal the contract price. The costs, as shown by this schedule, must be true costs for the items, obtained from the contractor’s original estimate sheet, and should the superintendent so desire he may require the contractor to submit to. him such original estimate sheets in verification of this fact. Where the cost of an item as set forth by the schedule is made up of sub-costs of various items, the superintendent shall, upon request, be furnished with special schedule showing the detail make-up of the various sub-costs involved by such items, for each of the several units included in the award. The schedule must be submitted by the contractor after signature by him, through the superintendent, and must carry the superintendent’s recommendation for approval when forwarded to the Veterans Administration for that purpose. After approval, one copy will be returned to the superintendent, one. copy to the contractor and the other copies retained in the files of the Veterans Administration. Since the schedule is to be used as the 'basis of estimates for monthly payments, same must be presented and approved prior to the submission of vouchers for any of such monthly payments and no vouchers will be passed for payment until after approved schedule is of record. # * * * *
21. TEMPORARY HEAT:
(a) The contractor shall furnish heat to prevent injury to work or material through dampness or cold. At all times when there is concrete not thoroughly set, and after starting to apply the first coat of plastering, he *402 shall maintain a temperature of at least 40° F. For 10 days previous to the placing of the interior wood finish and during the time that varnish is 'being applied, a temperature of at least 70° F. shall be maintained in the buildings.
(b) The temporary heat for drying the plaster or protection of interior trim and finish may be obtained by connecting the radiators for the buildings to the present lines of the heating system at the Station at such points as designated by the superintendent. All connections shall be made by the contractor at his own expense but the necessary steam for heat will be furnished by the Government, at no expense to the contractor.
(c) The use of open salamanders or other types of heating which may smoke and damage the finished walls, etc., will not be allowed.
‡ ‡
24. LIQUIDATED DAMAGES:
(a) The contractor will pay to the Government, by way of liquidated and ascertained damages and not as a penalty, the sum herein specified for each calendar day beyond the date or dates stated in his bid which he may require to complete the contract, to compensate the Government for its delayed possession. If any unit of the work contracted for is accepted in advance of the whole, the amount of liquidated damages then operative will be reduced in proportion to the total value of the work contracted for and of that remaining unaccepted. If a separate price has not been stated in the contractor’s bid for the work remaining unaccepted, determination of the value thereof will be made from the approved schedule of cost hereinbefore provided under “Schedule of Payments”.
(b) The deductions for failure to complete the work included under each item of the bid, in the time stated, will be at the rates noted in Amendments to Section 1G, “General Conditions”, all as subject to the provisions of paragraph on “Delays — Damages” in Government Form ox Contract.
* * * * *
9. Before bids were invited, General Condition 24 was amended, in accordance with instructions in a Presidential letter of October 8,1940, to include the following paragraph:
(c) Liquidated damages will not be assessed on account of delays caused by late deliveries of materials *403 where such late deliveries are shown to be due to priority deliveries to other agencies for use in connection with the National Defense Program.
10. (a) Preparatory to making a bid, plaintiff’s officials familiarized themselves with all the terms of the proposed contract, and requested 600 to 1,000 suppliers of materials and subcontractors to furnish quotations. Plaintiff received from one to ten proposals for each item on the job. Generally, it used the lowest quotation received in preparing its bid estimate, sometimes without being certain whether the supplier or subcontractor would be able to deliver or perform.
(b) Stanley M. Aragona, plaintiff’s secretary-treasurer at the time of the bid and now its president, prepared plaintiff’s bid. He based the bid on the plans and specifications, the contract time of 400 8-hour days, the quotations and proposals received from materialmen and subcontractors, respectively, and on the experience he had gained from bidding on and performing other construction contracts since 1929. He was then aware that there might be priorities. There is no evidence that anyone connected with the YA made any specific representations to the plaintiff as to whether the specified materials might, or might not, be available or whether the plaintiff would, or would not, be free of difficulties in obtaining materials required to perform the contract. In preparing its bid, plaintiff’s officials appear to have given little, if any, consideration to the possibility that priorities might impair plaintiff’s ability to perform and evidently thought it could perform within the 400 days provided in the contract.
(c) Plaintiff anticipated doing excavating, backfilling, grading, drainage, cement and concrete work, masonry, brickwork, carpentry, erection of millwork, hollow metal doors and frames, installation of hardware, and the laying out of roads and walks. It ultimately did all this work itself except the masonry and brickwork which it subcontracted on July 14,1942, long after it had let all other subcontracts. The balance of the work was to be done, and was done, by subcontractors, except the tile work which plaintiff did itself.
*404 11. On June 26,1941, plaintiff submitted its bid for a fixed price of $874,300.
12. On July 25,1941, tbe contract was awarded to plaintiff for a fixed price of $871,700. Tbe reduction in price from plaintiff’s bid of $874,300 was due to three minor changes in the specifications made before the award.
13. Plaintiff was notified to proceed with the work by a letter from the VA, dated August 11, 1941, which plaintiff received on August 12, 1941. Under the terms of the contract, plaintiff was required to begin work on August 22, 1941, and the contract time for completion was September 16, 1942, 400 calendar days after receipt of the notice to proceed. 14. Plaintiff sent its superintendent to the job site for the purpose of making arrangements for shanties, field office, and the laying out of the job for pile-driving operations. Before October 24, 1941, plaintiff had ordered all materials it needed to perform the work which it proposed to do itself.
15. Plaintiff also entered into 33 contracts with subcontractors for materials and for work which plaintiff did not intend to do itself. Twenty-seven of these subcontracts were entered into before October 24, 1941, and, by December 20, 1941, thirty had been entered into. Subcontracts that required extensive use of metals, such as plumbing and heating, were placed on August 19, 1941. Electrical work was subcontracted on August 26,1941.
16. There is some evidence that plaintiff requested subcontractors to supply lists of materials sometime in August. The first written evidence of such a request is a letter from the plaintiff to subcontractors, dated September 17, 1941.
17. Plaintiff knew, before it bid, of the possibility of priority orders being issued. On July 28,1941, plaintiff made inquiry of the VA about obtaining priority ratings required for the contract. On August 1, 1941, the VA sent plaintiff the forms to apply for such ratings.
18. (a) On August 20, 1941, the VA sent the following telegram to the plaintiff:
EE VAC 1185 FOET HOWARD AS BASIS PEOJ-ECT PEIOEITY EEQUEST TO BE FILED BY THIS SEEVICE SUBMIT COMPLETE LETTEE FOEM LIST OF MATEEIALS INVOLVED AND THE QUANTITIES THEEEOF ON WHICH DE *405 LIVERIES CANNOT BE OBTAINED WITHOUT PRIORITY RATING ALSO APPROXIMATE DELIVERY DATE REQUIRED FOR EACH TO MAINTAIN PROPER PROGRESS
(b) On September 13, 1941, the VA sent plaintiff the following letter:
Receipt is acknowledged of jour letter of September 10? 1941, regarding priority ratings for material required under your contract VAc-1185 at the Fort Howard Facility.
By telegram dated August 20, 1941, you were requested to furnish this office with a list of all materials on which you would require priority ratings, together with the quantities of such materials. This request was made of you in order that an effort might be made to obtain a general job priority covering all materials required under your contract. To date this information has not been received. It is believed that if you will promptly furnish such information to this office it will be possible to obtain the priority required by you in a much shorter time than if you attempt to deal directly with the Priorities Division, as indicated by your communication.
(c) On September 25, 1941, the VA sent the following letter to the plaintiff:
Reference is made to telegram to you under date of August 20, 1941, and follow-up letter dated September 13, requesting that you furnish this office with a list of all materials on which you would require priority ratings, together with the quantities of such materials, in connection with work under your contract VAc-1185 at the Fort Howard Facility. To date this information has not been received.
It has been suggested that your delay in this matter may be the result of the fact that you are endeavoring to obtain exact quantities of material required; approximate quantities only will be necessary and only those materials on the critical list which cannot be obtained without priority rating.
No action looking to request for a general job priority, covering all materials under your contract, can be made until same is received. Since the procedure necessary to obtain such priority requires considerable time, your immediate submission of the list of materials required is again requested.
*406 19. Plaintiff submitted a partial list of materials to tbe YA on October 23, 1941. On November 6, 1941, Extended Priority Eating Order P19A, assigning Preference Eating A-2, was issued. A complete list was again requested of tbe plaintiff, by telegram, on November 17,1941, and on November 19,1941, plaintiff submitted a complete list of materials needed for performance of the contract in accordance with tbe plans and specifications.
20. On October 24,1941, the VA sent tbe plaintiff the following letter, which the plaintiff received October 27,1941:
Since award of work under your contract VAc-1185 at the Fort Howard Facility, it has developed that certain materials specified cannot be obtained because of demand for same under the National Defense Program. Certain of such materials are listed below, together with acceptable substitutes therefor:
Specified Material Section 30
Copper wire clotii Copper tie wire Section 1200
Brass or wiiite alloy strips
Section 210 Copper
Copper expansion joints
Section 22C
18 ga. monel wire
Brass and white metal ground bead
Section 23CA Corkboard insulation
Section 32C
Chromium mirror frames
Substitute Material
Steel wire cloth, asphalt coated. Galvanized wire.
Plastic strips.
Note: All brass strips required in Operating Suite must be furnished in strict accordance with specification requirements as there is no acceptable substitute therefor.
Black steel sheets; heated and dipped in coal-tar pitch; then given two coats of approved metallic paint. All formed work to receive coal-tar pitch after fabrication.
Two angle formed 12 Ga. steel plates; set so as to overlap, and embedded in mastic.
16 ga. galvanized wire.
Plastic beads.
Fiber board of requisite thickness to secure equivalent insulation value.
Steel with two coats baked-on enamel.
*407 Specified Material
Substitute Material
Section 330 Hardware
Substitutions as outlined under Emergency Federal Specifications covering such material.
Sections IP and 2P Sheet lead
For vent pipe flashings through roof--
#24 gage wrought iron, heavily coated both sides with asphaltic paint.
For shower pans and dressing rooms—
Section IE
Zinc coated conduit
Membrane waterproofing.
Blade enameled conduit.
It will be necessary; for yon to submit proposals covering use of substitute materials. These proposals should be accompanied by a breakdown indicating the quantity of material involved and the unit price used in determining the credit submitted.
21, After receiving the letter of October 24, 1941, from the VA, plaintiff’s official, sometime in November 1941, had a conference with Col. L. H. Tripp, Director of Construction of the VA. They explained that plaintiff already had ordered practically all of the materials needed to perform the portion of the work it intended to do itself; that plaintiff had entered into practically all of its subcontracts; that the substitution of other materials for specified materials would require plaintiff to reorder its materials, renegotiate its subcontracts, and change its records, and that the extra work involved would result in an enormous amount of additional time, expense, overhead, and other costs to plaintiff and its subcontractors. No agreement was reached at this Conference which, by its terms, purported to modify the provisions of the contract or to provide for any specific allowance for overhead or profit on account of the changes.
22. On December 6,1941, plaintiff was given an A-2 priority rating issued by the O.P.M. On December 20, 1941, this priority was amended by an order, designated Prefer *408 ence Eating Order No. P19A, which contained the following limitations and substitutions:
1. Limited to 30 tons of Structural Steel for necessary framing other than support of roof.
2. Limited to 4Ys tons of Metal Lath for use in “Furring” only.
3. Limited to 13 tons of copper bearing steel sheets for use in construction of air conditioning ducts to Operating Suite.
4. Galvanized steel stair nosings are excluded and no substitute metal will be employed.
5. 14 and 16 gauge sheet steel required for construction of Hollow Metal doors and metal door frames are excluded except for construction of Kalamein Doors and metal frames at fire openings. All other interior and exterior doors and frames will be constructed of wood.
6. Sheet metal and steel tubing required for shelving will be excluded and wood substituted therefor.
7. Sheet metal for construction of fire hose cabinets will be excluded.
8. Sheet metal sleeves will be excluded.
9. Non-corrosive screen frames and metal suspension system will be excluded and Bonderized steel substituted therefor.
10. Brass or white metal edging strips or base beads will be excluded except for the quantity of brass grille strips required for the floor of the Operating Suite.
11. Brass spring bolts for insect screens will be excluded and Bonderized steel substituted therefor.
12. Brass cast drains, taps and plugs will be excluded and cast iron substituted therefor.
13. Brass, gas cocks, shut off valves and heavy fittings will be excluded and cast iron substituted therefor.
14. Brass nipples will be excluded and steel substituted therefor.
15. Large-size brass heating valves will be excluded and cast iron substituted therefor where commercially obtainable.
16. Chromium plated marble fittings will be excluded and enameled cast iron substituted therefor.
17. Bronze tablets will be eliminated and cast iron substituted therefor.
18. Bronze weatherstrips will be excluded and copper substituted therefor.
19. Bronze wire cloth for insect screens will be excluded and Bonderized steel will be substituted therefor.
*409 20. Copper will be excluded for flashings, downspouts, etc., and black iron substituted therefor.
21. 500# copper sheets will be included for construction of expansion joints.
22. 6000# copper tubing will be included for installation in concealed and inaccessible portions of the building, in accessible locations steel piping will be used.
23. Cast silicon iron pipe and fittings will be mcbuded for laboratory lines.
24. Wrought iron or steel pipe will be included.
25. Galvanized steel pipe and nipples will be excluded and black steel pipe substituted therefor.
26. Six pound sheet lead will be excluded for construction of floor pans in shower stalls and Membrane fabric substituted therefor.
27. All Hardware constructed in accordance with revised Emergency Federal Specifications will be included.
28. Cork and cork board insulating materials will be excluded and “rockcork” substituted therefor.
29. Magnesium pipe covering and blocks will be excluded and “Air-Cell” or “Rockwool” substituted therefor.
30. Cast iron enamelled [sic] plumbing fixtures will be excluded and vitreous China substituted therefor.
31. Stainless steel pitcher filler will be excluded and chrome substituted therefor.
32. Monel metal leg baths will be excluded and steel baths substituted therefor.
33. Cast brass W.C. floor flanges will be excluded and iron flanges substituted therefor.
34. Approximately one ton of chromium plated brass pipe and plumbing fixtures will be mcluded but chromium plated brass toilet accessories will be excluded and ceramic tile accessories substituted therefor.
35. Galvanized electric outlet boxes will be excluded and black enamel outlet boxes substituted therefor, also Bakelite or glass electric wall outlet and switch plates will be substituted for metal plates.
36. Non-Ferrous electric fixtures will be excluded and Ferrous and Glass fixtures substituted therefor.
37. All items of kitchen equipment and sterilizing equipment will be constructed in accordance with appro-of Federal
irass and Bronze will be excluded for construction of elevator doors, door trim and cabs and steel substituted therefor.
*410 PROVISIONS FOR MODIFICATION OF CONTRACTS TO FACILITATE PROSECUTION OF THE WAR AND ADJUSTMENT OF CLAIMS ARISING THEREFROM
23. On December 18,1941, Congress passed tbe First War Powers Act, 55 Stat. 838, 839. Sec. 201 of that Act provides:
The President may authorize any department or agency of the Government exercising functions in connection with the prosecution of the war effort, in accordance with regulations prescribed by the President for the protection of the interests of the Government, to enter into * * * amendments or modifications of contracts heretofore or hereafter made * * * , without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts whenever he deems such action would facilitate the prosecution of the war: * *
24. On December 27, 1941, the President promulgated Executive Order 9001, which reads in part:
TITLE i
1. By virtue of the authority in me vested by the Act of Congress, entitled “An Act to expedite the prosecution of the War effort”, approved December 18,1941, (hereinafter called “the Act”) * * * and as President of the United States and Commander-in-Chief of the Army and Navy of the United States, and deeming that such action will facilitate the prosecution of the war, I do hereby order that the Department of the Army, the Navy Department, and the United States Maritime Commission be and they hereby respectively are authorized within the limits of the amounts appropriated therefor to enter into * * * amendments or modifications of contracts heretofore or hereafter made, * * *, without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts. * * *
25. After the issuance of Executive Order 9001, the President promulgated a series of additional Executive Orders by which the provisions of Executive Order 9001 were extended to additional departments and agencies. Among these was Executive Order 9116, dated March 30, 1942. It extended the provisions of Executive Order 9001 to the VA (among other agencies) but only with respect to contracts made *411 by the VA after March 30, 1942. The record contains no explanation as to why, in the case of the VA, the application of these Executive Orders was limited to contracts entered into after March 30, 1942.
26. The Second War Powers Act of March 27, 1942, 56 Stat. 177, 179, amended the Act of June 28, 1940, 54 Stat. 676, as amended by the Act of May 31, 1941, 55 Stat. 236, to include the following provisions:
TITLE m — PRIORITY POWERS
*****
(5) Any person who willfully performs any act prohibited, or willfully fails to perform any act required by, any provision of this subsection (a) or any rule, regulation, or order thereunder, whether heretofore or hereafter issued, shall be guilty of a misdemeanor, and shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both.
(6) The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States and the courts of the Philippine Islands shall have jurisdiction of violations of this subsection (a) or any rule, regulation, or order or subpena thereunder, whether heretofore or hereafter issued, and of all civil actions under this subsection (a) to enforce any liability or duty created by, or to enjoin any violation of, this subsection (a) or any rule, regulation, order, or subpena thereunder whether heretofore or hereafter issued. Any criminal proceeding on account of any such violation may be brought in any district in which any act, failure to act, or transaction constituting the violation occurred. Any such civil action may be brought in any such district or in the district in which the defendant resides or transacts business. * * *
«5» * * * *
27. On August 7,1946, Congress passed an Act, commonly known as the Lucas Act, 60 Stat. 902, which included the following provisions:
* * * where work, supplies, or services have been furnished between September 16,1940, and August 14,1945, under a contract or subcontract, for any department or agency of the Government which prior to the latter date was authorized to enter into contracts and amendments or modifications of contracts under section 201 of the *412 First War Powers Act, 1941 * * such departments and agencies are hereby authorized, in accordance with regulations to be prescribed by the President within sixty days after the date of the approval of this Act, to consider, adjust, and settle equitable claims of contractors, including subcontractors and materialmen performing work or furnishing supplies or services to the contractor or another subcontractor, for losses (not including diminution of anticipated profits) incurred between September 16,1940, and August 14,1945, without fault or negligence on their part in the performance of such contracts or subcontracts. * * *
This Act further provided that claims should be filed within 6 months after August 7, 1946, with the head of the department, and that dissatisfied contractors or subcontractors should have the right within 6 months to file a petition in any federal district court having jurisdiction to determine the equities involved in the claim.
28. (a) At the outset of plaintiff’s performance of the contract it was necessary to clear the ground, excavate, and drive a pile foundation. The subcontract provided for completion of pile driving by October 17,1941 — within 60 days of its acceptance, August 18,1942.
(b) By September, various unanticipated problems became apparent that affected the pile-driving phase of the work. These derived mainly from unexpected subsurface conditions. They delayed completion of the pile foundation until December 9, 1941, 52 days after the date originally anticipated.
(c) Plaintiff did not apply under the contract for an increase in contract price or an extension of time because of delays in the pile driving occasioned by these unexpected soil conditions.
(d) The time required for driving the piles was not affected by shortages of materials or priorities and the delay in completion of this phase of the work forms no part, directly, of the basis for the claim the plaintiff asserts in this action, which is aimed at recovery of losses plaintiff attributes to changes in the contract it performed (as compared with provisions it originally undertook to perform) that resulted from Government priority regulations which prohibited the use of materials originally specified and required substitute *413 materials to be used instead. The parties are agreed that none of the changes that occurred in 1941 was caused by priority regulations.
(e) The delay that occurred in the driving of the piles, through its bearing upon the timing of later events, did, however, affect the aggregate time plaintiff had to procure substitute materials and to obtain approval of their use before they were needed. It affected, also, the impact, upon plaintiff’s costs, of a changing labor market which caused labor to become increasingly scarce and expensive in 1942 and the delay it caused may have had a bearing upon other factors pertinent to the cost and timing of the overall performance of the contract.
(f) In October 1941, after it had become apparent that there would be difficulties with the piles, plaintiff submitted to the defendant a progress chart which indicated that the pile driving would take 2 months longer than originally contemplated. At the end of December 1941, shortly after the pile driving was completed, the work was .07 percent ahead of the schedule established by this progress chart.
29. (a) After the driving of the piles, the next step was pouring the reinforced concrete structure. Other work inside the building could not proceed until at least one or two of the concrete floor slabs had been poured.
(b) The concrete structure was built by pouring the concrete into forms in which reinforcing rods and sleeves were placed (the latter to form holes in the concrete for the later installation of utilities). The setting of the reinforcing rods and sleeves was done by subcontractors. Plaintiff itself directly hired the carpenters who made the wooden frames and the masons and laborers who poured the concrete.
(c) The beginning, the progress, and the completion of the concrete work were all delayed. The delay at the beginning was partly a result of the delay in completion of the pile foundation but other causes also contributed. Even after its belated beginning, the concrete work proceeded at a slower rate than originally was anticipated. Neither priorities nor material shortages appear to have been a dominant cause of these delays. They were attributable, *414 primarily, to other causes, summarized in the findings immediately following.
(d) On October 11, 1941, the date originally anticipated for completion of the pile foundation, material and labor necessary to build the frames, set the pans, rods, and sleeves, and pour the concrete, were either on the job or available. The work could not proceed then, however, because of the delay in driving of the piles, which was not caused by priority regulations.
(e)- By the time the driving of the piles was completed, and the plaintiff was ready to proceed with the concrete work, the demand for labor had risen sharply in the Fort Howard area. Competent workmen, especially carpenters, were difficult to get, and increasingly expensive. Plaintiff’s difficulties in procuring adequate competent labor caused delay in commencing and in performing the concrete work, especially during the early stages, and added to its costs.
(f) The collapse of an inadequately braced hoist tower that damaged some of the forms and pans already in place for pouring concrete also contributed to the delay in the concrete work.
(g) On December 19 or 20, 1941, plaintiff was instructed to substitute wooden for metal sleeves. Due apparently to some misunderstandings, correspondence between plaintiff and defendant about this change continued thereafter into February of 1942. It is not apparent, however, that this exchange of views about the material to be used for the sleeves caused the beginning or the completion of the concrete structure to be delayed more than it would have been delayed anyway by other factors.
(1) Had the concrete work commenced according to the original plan instead of being delayed by the difficulties with the piles, it could have been completed before labor became scarce in the spring of 1942.
(2) The plaintiff was informed that wood sleeves should be used instead of steel, and instead of other substitute materials, sufficiently ahead of the time when this work was actually commenced to enable it to make the necessary changes well before it had resolved other problems and was ready to proceed with the concrete.
*415 (b)The evidence, as a whole, affords no adequate basis for finding that the delay that occurred in pouring the concrete was fairly attributable to priority regulations.
CHANGES RESULTING FROM PRIORITY REGULATIONS
30= (a) Once the first of the floor slabs was poured, other work on the hospital could proceed. Much of this other work was subject to changes based on priority regulations which prohibited or limited the use of materials originally specified in the contract.
(b) During performance of the contract, the YA made a total of 65 changes, designated as change orders, four changes that were merely time extensions, and 37 changes designated as minor modifications. These change orders and minor modifications were issued between September 1941 and February 1944, as follows:
Number Issued Change Orders Minor Modifications Period Issued
4 1 Sept.-Dee. (1941)
23 14 Jan-June (1942)
20 6 July-Dee. (1942)
4 9 Jan.-June (1943)
10 6 July-Dee. (1943)
4 1 Jan.-Feb. (1944)
Total 65 37
(c) Of the total changes, 35 provided for the use of substitute materials in place of those originally specified and two eliminated materials originally specified, without substituting others. Only one minor modification required a substitution of materials dictated by a priority order. That was the change, ordered on December 1941 by Minor Modification 5, from steel to wooden sleeves in the forming of the concrete structure. As indicated in finding 29, that change was not a cause of delays beyond the time required by other factors unrelated to priorities.
(d) The evidence contains detailed summaries proffered by both the plaintiff and the defendant which identify, with respect to each of the change orders, the nature of the change to be accomplished, the contracts affected (whether the general contractor or one or more of the various subcontractors), *416 the resultant addition to or deduction from tbe cost of the work, and any allowance of overhead or profit in connection with the change in cases where overhead or profit was allowed.
The figures in these summaries differ in minor details, and the defendant’s summary includes the dates when defendant requested each of the changes, when the plaintiff submitted its proposals and when they were accepted, and certain other information not included in the plaintiff’s summary. They are in approximate agreement, however, in showing that the changes resulted in additions to the cost of the work, totaling between $51,750 and $52,000, deductions from the cost of the work of $62,652.62, and additional commissions, overhead, and profit to plaintiff of between $1,500 and $2,200.
(e) The record contains, also, a vast amount of correspondence between plaintiff and defendant’s representatives, and others, as well 'as much oral testimony that shows various steps taken and numerous difficulties encountered by the parties in their efforts to work out the adjustments necessary to accommodate performance of the contract to the changes required by the priority regulations, and to overcome other difficulties created by the war.
(f) Inasmuch as the plaintiff does not appear to compute the amount of its claim upon a cumulative aggregation of individual items of damage specifically related to the several change orders, it appears that it would not contribute to a clear statement of the primarily significant facts to include a detailed catalog of this evidence in these findings.
(g) The net result of all these activities was that performance of the contract was ultimately completed on November 19, 1943, 429 days after the time originally projected for its completion.
The work was accepted and extensions of time, totaling 429 days (hereafter described in more detail), were granted which relieved the plaintiff of obligations it otherwise might have had under the contract for delay in completing performance.
The contract price was reduced by $9,372.28, from $871,700 to $862,327.72. The VA paid the plaintiff $861,-827.72 for the work done and, of the remaining $500, with *417 held $480.77 for items claimed to be incomplete, and other adjustments, and offered to pay plaintiff the balance of $19.23, in full settlement of plaintiff’s claim under the contract.
(h) Plaintiff refused to accept the $19.23 proffered, and, on March 16, 1944, filed, with the Comptroller General, claims for itself and on behalf of its subcontractors. These claims were rejected.
(i) Plaintiff did not file its claims with the VA nor did it file any application for relief under article 3 (Changes) or article 15 (Disputes) of the contract. Believing it was not eligible for relief under the Lucas Act, referred to in finding 27, plaintiff did not seek or receive any relief under that Act.
(j) The plaintiff claims here that, in the aggregate, it was damaged to the extent of at least $68,028.03 because of increased work, delays, and other factors of cost which it attributes to changes necessitated by the substitution of materials and other changes resulting from priority regulations. The amount now claimed is the plaintiff’s total loss on the performance of this contract, as shown by an audit subsequently prepared.
31. After the beginning of 1942, changes in the performance of the contract in order to conform with limitations imposed by the priority regulations created a variety of problems for the plantiff, the defendant, and the subcontractors. It is to costs the plaintiff says it incurred in accommodating its performance to such changes that it now attributes the damages it claims in this action.
The following findings summarize the procedures that were followed in the parties’ efforts to adapt their performance to these changes.
32. (a) The original specifications were not formally revised to reflect the substitution of permissible alternatives in place of specified materials excluded by the priority regulations.
Instead, where use of the specified materials was barred by the regulations, the plaintiff and its subcontractors were required to find substitute materials they deemed suitable *418 for particular parts of the work and to make proposals to the YA for the use of the substitutes.
(b) Such proposals showed the quantity to the materials originally specified, the nature and quantity of the substitute materials proposed to be used instead, the unit price of each quantity, and the resultant increase or decrease proposed in the contract price.
(c) If the substitute materials cost less than those originally specified, the orignal contract price was decreased, but only by the saving in the cost of materials and labor. Profit and overhead figured on the basis of the orignal bid were not reduced but were retained by the contractor.
(d) If the substitute materials cost more than those originally specified, a corresponding addition to the original contract price was proposed, and, in some circumstances, additional overhead and profit were also allowed, where the substitution increased the material and labor costs.
(e) The allowance of profit, overhead, and commission on change orders issued by the YA was based on a “Letter of Supplementary Instructions No. 26,” an internal policy memorandum of the YA, issued in 1986, which included the following statement:
Letter of Supplementary Instructions No. 26
RE : PROPOSALS POR CHANGE ORDERS.
There has been some lack of uniformity in the methods of arriving at the proper money value of change orders. The underlying principles forming the basis of all change orders are found in Article 3, Standard Form of Contract, which in part reads as follows:
“If such changes cause an increase or decrease in the amount due under this contract or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly.”
The amount of change orders increasing the contract price should be a fair amount for the additional work covered. This applies whether the work is performed directly by the contractor or by the sub-contractor. The following general rule should be followed unless there are special reasons for deviating from same:
*419 Proposals forming tbe basis of Change Orders increasing the contract price should be based on the net cost of additional material and labor involved plus the proper allowance for overhead and profit.
In the cases of proposals for Change Orders increasing a contract by an amount of $250.00 or less, allowances of 10% overhead and 10% profit may be made.
In the cases of proposals for Change Orders over $250.00 the following guides should be followed:
1. Where material and labor are furnished by the same sub-contractor and only one main item is involved, the contractor should be allowed not more than 10% commission on the actual cost of the change.
2. "Where there is a change of material only, e.g., from common to face brick, limestone to granite, from one type of flooring to another, not more than 10% commission should be allowed.
3. In cases where work in place is performed by sub-contractor, the contractor shall be allowed not more than a 10% commission on the sub-contractor’s price, which price should be the actual cost plus a proper allowance for overhead and profit.
WTaere changes increasing the contract price involve credit items, such items should be deducted prior to adding any percentages for overhead or profit.
"Where proposals for Change Orders involve items deductible from the contract price the value of such items should be net, that is, they should not include either overhead or profit.
When changes or modifications are necessary, you should make your independent estimate of the value of the items involved and the total of the change, and forward same with the contractor’s proposal, giving your definite recommendations as to the necessity for the change and correctness of the contractor’s proposal.
Although the plaintiff was never given a copy of these instructions, it was informed, from time to time, of the bases for the defendant’s rejection of proposals it submitted for allowance of profit or overhead on particular changes.
(f) Plaintiff did not, within 10 days of the issuance of any change or modification, file, under the “Disputes” clause or *420 the “Changes” clause of the contract, any claims asserting that the compensation allowed was insufficient.
(g) At no time, in the course of the performance of the contract, did the defendant express to the plaintiff an undertaking to pay more than the amounts provided for under the contract.
33. (a) If a required change involved work to be performed by the plaintiff, it was necessary for the plaintiff to obtain a statement of quantities and unit prices of the substitute materials from its material suppliers and, in accordance with the procedure summarized in finding 82, to make a proposal to the VA based on such information.
(b) If a required change involved work to be performed by subcontractors, it was necessary for the plaintiff to ascertain the subcontractor affected by the change and ask him to make a proposal based on the use of substitute materials. The subcontractor then would communicate with his suppliers. Sometimes they, in turn, had to get in touch with as many as three or four tiers of their own suppliers before all of the information necessary for the proposal could be obtained. After the subcontractor obtained such information, he made a proposal to the plaintiff who then made a proposal to the VA based on the subcontractor’s proposal.
(c) Where samples of the materials originally specified had been required, it was necessary to procure and submit new samples of materials proposed to be substituted.
(d) Frequently the VA did not accept the first proposal made. In that case, plaintiff (and its subcontractors, where subcontractors were involved) had to repeat the procedure. Sometimes plaintiff submitted three or four proposals with respect to a single change before one was accepted. In some cases, several months intervened before a proposal was accepted by the VA. Only occasionally was plaintiff permitted to proceed before the official change order was issued.
Sometimes, on the other hand, substantial delays occurred between the time it was apparent that a change would be needed, or that a rejected proposal had to be revised, and the time when the plaintiff submitted a proposal or, even, in *421 some cases, initiated inquiries necessary for preparation of a proposal.
(e) After the VA accepted plaintiff’s proposal, plaintiff would notify its superintendent to carry out the changes on the job that were required by the change order.
(f) If the change order affected a subcontractor, he was notified after the proposal was accepted in order that he might make the required changes in his part of the work.
(g) Sometimes a single change order affected as many as six subcontractors. In such cases, plaintiff had to go through the procedure described above with each one.
(h) All of these steps took time. Almost inevitably, their net effect was to delay the time when plaintiff was ready to perform particular parts of the work where changes were required. This, in turn, delayed overall performance except where previous delays from other causes had already so delayed preceding steps as to afford ample time to arrange for the necessary changes in the particular instance before the job was ready for the substitute materials. In addition to costs that may have resulted from delays attributable to material changes, such changes also added to the cost of the work whatever additional direct expenditures plaintiff had to make in order to perfect arrangements for the changes.
(i) It is far from clear that the plaintiff acted with optimum promptness and efficiency, in all cases, in initiating and carrying through the steps necessary to perfect proposals for change in materials, once it was apparent that changes were necessary. Neither is it wholly clear that the defendant’s representatives were always as prompt as they might have been in responding to proposals that were submitted to them.
There is evidence that, at one time, the defendant’s representatives sought, without success, to have the plaintiff consolidate its requests according to an integrated program instead of submitting them piecemeal. Whether plaintiff could have done this, in the circumstances that prevailed, it is impossible to tell from this record. The evidence creates the impression that locating and procuring suitable substi *422 tute materials was largely a catch-as-catch-can operation, in a badly confused market, and tb.at consolidation of plaintiff’s needs into a well-integrated procurement program may have been beyond the practical possibilities inherent in the general situation created by the onset of hostilities.
(j) In summary, the evidence does not show exactly what caused all of the many delays that occurred in initiating and carrying out the steps necessary to accomplish the several changes. In the absence of such evidence, the mere passage of more time than it now seems, 20 years later, should have been necessary to carry out particular actions is scarcely an adequate basis for finding that, in the conditions that prevailed at the beginning of the war, such actions were dilatory.
Nor is it apparent that such a determination would contribute substantially to a decision here. The fact is, as elaborated hereafter in findings 35 through 46, that extensions of time, coextensive with the aggregate delay that occurred in performance of the contract, were granted, and it is a reasonable inference from this that, at the time, defendant’s representatives did not regard the plaintiff as reprehensibly dilatory in its performance of the contract.
(k) Without more definite standards for comparison and appraisal than the evidence affords, there is no adequate basis in this record for attributing dominant fault to either the plaintiff or the defendant for the delays that occurred, or for measuring, with reasonable precision, the relative extent, if any, to which either might fairly be regarded as responsible for causing such delays. All parties concerned were attempting to deal with a difficult, constantly shifting, situation created by the beginning of the war. Apparently, neither the plaintiff nor the defendant functioned with the efficiency it would be reasonable to expect if they had been operating in normal circumstances. On the basis of this record, however, it is impossible to reach a firm conclusion that either was delinquent in dealing with the succession of emergencies that confronted them to an extent that would sustain a finding that either was primarily at fault in extending the delays or augmenting the confusions and disruptions *423 induced by the war. It seems reasonably clear that performance of the contract was impeded and its completion, according to the schedule and the terms projected when it was undertaken, was prevented, in part, at least, by conditions arising out of the war emergency for which the plaintiff was not responsible.
34. (a) Plaintiff’s efforts to obtain the information needed to make proposals for substitution of materials in place of those specified which could not be used included a large amount of correspondence and numerous discussions — personally and by telephone — with defendant’s representatives, with subcontractors, and with suppliers of materials.
In the main, although doubtless some effort was wasted, this correspondence and these personal negotiations were necessary in order to attempt to handle the changes necessitated by the war emergency, including changes in materials that were required by priority orders.
It is a reasonable inference that more time and effort were expended by the plaintiff’s office staff in accommodating its performance to the requisite changes than would have been needed to perform the contract, using the materials originally specified, or that might have been needed to accomplish, in normal times, substitutions of materials similar to those that were necessitated by priority orders.
Whether the delays that occurred, or the total of plaintiff’s direct costs, would have been less, if plaintiff had not reduced its office staff, or if its executives had spent more time than they did at the job, is largely conjectural. It is not clear from this record that the retaining, by the plaintiff, of additional executive or clerical personnel, presumably at additional cost, or the maintaining, by the plaintiff, of closer on-the-job supervision than was maintained by plaintiff’s executive officers, would have speeded the work sufficiently that the net cost of making the required changes would have been less than it was.
(b) The evidence does not include specific, itemized proof of the costs plaintiff incurred in arranging the various *424 changes. Nor does it show specifically the effect, in terms of cost, of delays attributable to substitution of materials. Moreover, it does not distinguish such costs from costs that resulted from other causes or that might have occurred even though performance of the contract had taken its originally projected course, without need for changes induced by priority orders. While the record affords no basis for computing costs on delays specifically identifiable as having resulted from changes induced by priority orders, plaintiff introduced evidence to establish its total costs for the project. It did so in the belief that it was entitled to receive these costs as the reasonable price for performance of a contract it now claims was entirely different from the one it originally signed.
35» (a) In making its proposals in connection with some of the change orders, plaintiff stated that the proposed changes would require an extension of time. In other instances, where it was difficult, if not impossible, at the time the proposals were made, to anticipate how much time would be needed to carry out the changes they proposed, the plaintiff did not request an extension of time when the proposal was made.
(b) In most cases, the change orders and minor modifications, issued by the defendant in response to plaintiff’s proposals, stated that no extra time was involved, although some of the orders said that consideration would be given later to time extensions.
36. On October 28,1942, plaintiff notified the VA that it was preparing a request for an extension of time based on the following reasons:
* * * We are basing our request for this extension of time on delays which have been absolutely beyond our control; the principal cause being the creation of innumerable change orders for substitute materials, other than originally specified, made necessary by limitation and restriction orders issued by the War Production Board in the use of vital materials because of the National Emergency. In this connection we respectfully refer you to page Al G-2, paragraph 5, Article Bl, *425 which, states, “liquidated damages will not be assessed on account of delays caused by late deliveries of materials where such late deliveries are shown to be due to Priority deliveries to other agencies for use in connection with the National Defense Program.”
37. On November 10,1942, plaintiff submitted the application for an extension of time that was forecast by the letter referred to in finding 86. It requested a total extension of 273 days. Of this total, 130 days were requested for the time required to obtain the priority rating and 143 days were requested for delays caused by Change Orders H through ZZ and Minor Modification 5, all of which were issued before the end of September 1942. The plaintiff’s letter included the following statement:
# # Hí ❖
_ We contend that the system of Priorities and restrictive orders issued by the O.P.M. and the W.P.B. thereby necessitating an abnormal amount of changes in materials, have been principal causes of delay upon which this application is based.
This request involves the period of time specified to do the entire work, which is 400 calendar days, from August 12,1941, the date of your Notice to Proceed, to September 16,1942.
During this time, an extended delay took place in our endeavors to obtain a priority rating for this job and subsequent delays were caused by the issuance of 38 change orders and 16 Minor Modifications.
By listing these reasons below, we endeavor to determine the amount of additional time required for each change order and minor modification and request that special consideration be given the first item wherein we request an extension of 130 days, which was the period from August 12, 1941, the date of Notice to Proceed, to December 20, 1941, the date of your submission of Extended Preference Rating Order, Number P-19A, Builder’s Serial Number 2876-A Amended, during which time we obtained lists of all materials required for the construction of the entire project from all subcontractors and material suppliers and submitted same to you to aid in your endeavors to obtain the Priority Rating necessary at the time.
*426 REASON TIME REQUESTED[9]
Priority Eating 130 Days
Change Order “H”_ 1 Day
a u «jjj 3 Days
u u “M” __ 2 Days
u a “N” 20 Days
a u “G” - 5 Days
u u “U” — % Day
u u “Z” - 2 Days
a a “AA” % Day
u a “CC” 1 Day
a u “II” 3 Days
u u “JJ” . 30 Days
a a “LL” _ 40 Days
Minor Modification No. 5 35 Days
Total 273 Days
% :J: * * =!=
The plaintiff’s letter also included a statement of reasons for the 143-day extension it requested because of change orders and Minor Modification 5. These are elaborated in the letter quoted in finding 38. Accordingly, they are not stated here.
38. On December 7,1942, at the request of the VA, plaintiff submitted additional information in support of its request, originally made in its letter of November 10, for an extension of 143 days, because of Change Orders H through LL and Minor Modification 5. The following text is quoted from plaintiff’s letter of December 7, 1942:
‡ H* # }}:
Change Order “H” increased the amount of reinforcing steel in South Loading Platform.
Eequest for this change was made by your Superintendent of Construction under date of January 28, 1942. Our proposal was submitted under date of February 4, 1942, and your acceptance for an increase of $13.01 is dated February 9, 1942. Formal change order is dated February 18,1942.
Change Order “I” added five additional telephone outlets, also five additional duplex convenience outlets, and the furnishing and installing of additional conduits for telephone terminal box in room #26 to boxes “T” *427 and “U”, all as directed by the Superintendent of Construction.
Request for this change was made by Superintendent of Construction on January 16,1942, and separate proposals for each of the changes were submitted on January 28, 1942, and your acceptance of all three proposals totaling an addition of $357.04 was submitted under date of February 11, 1942. Formal proposal is dated February 18,1942.
Change Order “M” provides for the furnishing of treated joists over refrigerators which were part of the refrigeration contract that had not been let at the time that this material was required.
Request for this proposal was made by your Superintendent of Construction under date of February 10, 1942, and our proposal was submitted to you on March 10, 1942. Your acceptance for an increase in the sum of $171.55 is dated March 20, 1942, and formal order is dated March 26, 1942.
Change Order “N” provided for the substitution of fabric and mastic type spandrel waterproofing in lieu of copper spandrel flashing specified.
On January 13, 1942, we requested your consideration of a proposal to substitute “Sandell” type “L” flashing in lieu of copper. On January 17 you advised us there was no objection in our submitting this proposal for your consideration and also requested a comparative proposal for the use of coal tar pitch-coated steel. During the latter part of January, our Mr. Auf der Heide visited your Central Office and was informed that you preferred a metallic material.
Our proposal for the substitution of Cheney 26 gauge Pitch-on-Metal in lieu of copper was submitted to you on February 11, 1942. On February 16 you also requested us to submit a proposal using “Colis Super Defense Flashing”, in lieu of copper. On February 28 we submitted proposal covering the substitution of both “Sandell” and “Colis” Flashings, and also submitted an alternate proposal covering a fabric and mastic type spandrel waterproofing, in lieu of copper.
On March 5 you referred to these 3 proposals and advised that the fabric and mastic type flashing would be approvable under certain conditions. *428 Under date of March 20, 1942, you accepted our proposal submitted to you on February 28 for the fabric and mastic type material for an increase of $215.00. Formal proposal was submitted under date of March 26.
Change Order “Q,” provided for %” medium pressure steam connection to Pack Sink in Room #5 with gate valve in pipe space; %” medium pressure steam and %” return connections to sterilizer in room. #41 with gate valve on steam line in pipe space; providing and installing 40 square feet convector unit in recess outside of Eoom #28 with valve trap and connections; and 40 square feet convector unit outside Meat Preparation Room with valve trap and connection; all in agreement with sketches submitted.
Request for this proposal was made by your Superintendent of Construction on February 4, 1942. Our proposal was submitted to you on March 2, 1942, and your formal acceptance submitted under date of April 1, 1942, for an increase of $586.94.
Change Order “V” provided for the changing of partition between Garbage, Refrigerator and Can Wash Rooms, as well as partition between Trash and Vegetable Rooms from 4" to 6" partition tile and to construct 8" walls forming East and West Walls of Meat Refrigerator Room of Load-bearing tile, in lieu of partition tile.
Request for this change was made by your Superintendent of Construction on February 2,1942, and our proposal submitted on March 28, 1942. On April 4, you advised us that our estimate was in excess of your office estimate. On April 15 we sent you copy of letter from the Masonry Sub-Contractor which did not agree with your office estimate. On May 1, you accepted the proposal for an increase of $56.25, stating that you had determined the amount as an equitable price in agreement with your office estimate. Formal Change Order was submitted under date of May 4, 1942.
Change Order “Z” provided for the furnishing and installing Type 3 Clothing Bins and Type 7 Shelving, including Shelving in Dark Room to be fabricated of wood in lieu of metal specified, and substituting plain pipe painted in lieu of galvanized pipe for Type 10 racks. The wood shelving to be painted in accordance with Section 31C covering this type of construction.
*429 Request was made for this change by your Central Office on January 28, 1942. On March 2 we submitted our proposal as a Minor Modification. On May 25, your Central Office advised that a credit of approximately $152.00 should be due the Government for this change. On May 29 we submitted our proposal offering you a credit for the amount requested, $152.00. Under date of June 5, you accepted this proposal. Formal change order was submitted under date of June 9, 1942.
Change Order “AA” provides for the installation of wood insect screens on the outside of window guards in agreement with revised drawings #225-22R-2, for all windows in rooms #3 and #46.
Request was made for this change on April 1,1942, and our proposal was submitted on May 14, 1942, for an additional sum of $39.12. On May 19 your Central Office advised us that the price was excessive. On June 5, we advised you that because the wire guards were shipped to the Job we would do the necessary work in the field ourselves, for an additional sum of $35.56. On June 12, you accepted our proposal for an increase of $35.56. Formal Change Order was submitted under date of June 13, 1942.
Change Order “CC” provides for the installation of 3" conduit run on pipe space ceiling from points where present telephone cable enters Pipe Basement, and relocating 20" x 24" x 6" telephone junction box where this new conduit line intersects service line for new building.
Request for this change was made by your Superintendent of Construction on June 11, 1942. Our proposal for an increase of $73.93 was submitted on June 22, and your acceptance of the proposal is dated July 8, 1942. Formal Change Order is dated July 14,1942.
Change Order “II” provides for the construction of 12 alcoves for drinking fountains involving an increase of $298.10.
Request for this change was made by your Superintendent of Construction on May 12, 1942, and our proposal submitted on July 31, 1942. Your authorization to proceed for an additional sum of $298.10 is dated August 13 and formal change order is dated August 18,1942.
*430 Change Order “JJ” provides for certain changes in Plumbing and Electrical Work in relocating Kitchen equipment in accordance with drawing #225-2Rl in lieu of location shown on original contract drawing.
Request for this change was made by your Superintendent of Construction December 9, 1941. On January 19 we submitted our proposal as a Minor Modification. On January 27 our proposal was returned by your Superintendent of Construction with a detailed break-down showing a credit due the Administration in the amount of $104.35. On March 23 we submitted break-down from our Plumbing Sub-Contractor and proposal requesting an increase in the sum of $189.18. On April 16 you advised us to eliminate the masonry work and requested a credit of $82.12 for these changes. On .July 8, 1942, we submitted another proposal requesting an additional sum of $55.41 with which we sent you our Plumbing Sub-Contractor’s revised break-down.
After a conference held at your office by our Plumbing Sub-Contractor, our Mr. Aragona and your Mr. Fahy, it was agreed to submit proposal for a decrease in the sum of $61.57. This proposal was submitted on August 7, and accepted by you on August 15,1942. Formal Change Order was issued on August 21,1942.
Change Order “LL” provided for the performance of all work to affect changes indicated by drawing #225-32RA and 225-37RA, which eliminated structural steel in roof of Kitchen Wing and Main Roof and substituted concrete construction in Kitchen Wing and wood construction in Main Roof.
Request for this change was made December 10, 1941, and our proposal requesting an additional sum of $1331.45 was submitted on January 8,1942. Conditional acceptance was made by you on January 15, thereby allowing us to proceed with the work.
On February 20, you advised us that a detail check of itemized break-down of cost had been made by you and the proper amount would be an increase of $534.35, instead of $1331.45 requested. On August 25, 1942, we advised that we accepted the estimate prepared by your office. Formal Change Order *431 for an increase of $534.35 was issued on September 10, 1942.
Minor Modification #5 involved the substitution of wood sleeves in lieu of rigid pipe for Plumbing and Heating Lines. We were ready to pour the easterly end of basement slab on November 12,1941, but because of W.P.B. restrictions were unable to secure the rigid pipe for sleeves.
Under date of December 19, your Central Office advised us by letter “Via Air Mail”, that framed wooden sleeves were approved on the following-conditions :
1. Where the top and bottom of the sleeve holes are concealed in the finished work, frame sleeves may be used.
2. Where the top and bottom of the sleeve holes must be concealed by floor and ceiling plates, framed sleeves may be used, conditional that the holes are of such size that they can be concealed without the use of oversize floor and ceiling plates.
Upon the acceptance of this approval we were able to make our first pour on December 30, 1941.
* ❖ * * *
39. On January 9, 1943, the VA issued Time Extension No. 1, granting, in the following terms, the extension of 130 days requested November 10, 1942, on account of delays in delivery due to priorities:
Reference is made to your contract VAc-1185 dated July 25,1941, for construction of Hospital Building No. 225 at Veterans Administration Facility, Fort Howard, Maryland, and to that portion of your letter dated November 10, 1942, requesting extension of time because of delays due to the effect of priorities upon delivery of materials.
I have ascertained the facts and extent of these delays, and find that you experienced delays in delivery of certain material due to priority contracts incident to the National Defense Program. Late delivery of the materials indicated served to delay your contract work as a whole 130 calendar days. Accordingly, your contract time is hereby extended 130 calendar days.
40. On February 18,1943, the VA issued Change Order ZZ, granting, in the following terms, an extension of 85 days *432 due to Change Orders A through LL and Minor Modification 5 (instead of the 143 days plaintiff had requested) :
With reference to your contract dated July 25, 1941, for construction of Hospital Building #225 at Veterans Administration Facility, Fort Howard, Maryland, you are informed that upon further consideration, based upon your letter dated November 10, 1942, of the following indicated changes thereunder:
Performing the work contemplated by Change Orders “A” to “LL” inclusive, and Minor Modification No. 5 in accordance with your respective proposals,
additional time of eighty-five (85) calendar days is hereby granted in accordance with Article 3 of the general provisions of the contract. The change in contract price has heretofore been covered by the change orders referred to.
Plaintiff made no claim within 10 days for an adjustment of price because of this change order.
41. On June 15,1943, plaintiff requested an extension of 180 days, in addition to the 215 days previously granted (130 on account of delay in priorities and 85 on account of Change Orders A to LL and Minor Modification 5). The text of this request is as follows:
Supplementing our Mr. Aragona’s recent conversation with your Mr. Fahy relative to making application for further extension of contract time in connection with the above Project, kindly be advised that we have examined all Change Orders approved to date, exclusive of those upon which previous time extension has been f ranted, and we find that only three are purposely eligi-le for reason to request extension of time, thereon, being Change Orders “MM,” “UU” and “XX.”
Change Order “MM” provided for the substitution of galvanized wrought iron pipe and galvanized malleable iron fittings for all copper tubing specified for hot and cold water and circulating systems.
This change was requested by you under date of March 24, 1942, and our proposal was submitted to you on June 15, 1942. At a conference held at your Washington Office on July 2, 1942, and attended by our Mr. Aragona, our Plumbing Subcontractor, Mr. Kay, your Mr. Craven and Mr. Fahy, it was agreed to submit a revised proposal for this change. Our revised proposal *433 was submitted to you on July 15, 1942. During tbe early part of August we started with tbe installation of water lines, prior to receiving your acceptance of this Change Order, which is evidenced by letter dated August 10, 1942, by your Superintendent of Construction. On August 15, 1942, your Mr. Fahy authorized us to proceed with the changes covered by the proposal, but advised that approval of materials was required before proceeding and referred to letter dated August 10th by Superintendent of Construction that we were proceeding at our own risk. On August 21, 1942, another conference was held at your Washington Office attended by Mr. Kay, Mr. Hepburn and Mr. Fahy at which time the amount of the proposal was agreed upon. On September 1, 1942, our third and final revised proposal was submitted to you and your letter of acceptance was submitted under date of September 15, 1942. Formal Change Order was submitted under date of September 22, 1942, increasing our contract price by $2,503.01.
Change Order “UU” provided for the substitution of standard cast iron soil pipe and fittings for all vertical soil, waste and vent stacks extending through more than one floor, in lieu of galvanized steel pipe, as specified.
Our original proposal for the substitution of black steel pipe m lieu of galvanized steel was submitted by us on February 18,1942, in accordance with Coordinated List of Materials attached to Preference Eating Certificate, dated January 13,1942. Under date of March 24, 1942, your Mr. Fahy advised us that, in view of further amendment of Preference Eating, whereby standard cast iron pipe will be substituted for soil, waste and vent stacks, no action would be taken on the proposal submitted and requested the submission of a new proposal covering the substitution of cast iron in lieu of galvanized steel. On June 15, 1942, our proposal was submitted as requested. After a conference attended by our Mr. Aragona, Mr. Kay, your Mr. Craven and Mr. Fahy at Washington on July 2, 1942, a revised proposal was submitted under date of July 10, 1942. Under date of July 25, 1942, Mr. Fahy directed us to proceed with the work covered by the proposal subject to later determination of exact cost and necessary time extension. After another conference attended by Mr. Kay, Mr. Aragona, Mr. Peoples and Mr. Fahy at Washington on December 3, 1942, and upon the subsequent submission of invoices to verify list prices and discounts allowed in our proposal, Formal Change Order was issued under date *434 of December 28, 1942, increasing our contract price by $2,118.04.
Change Order “XX” provided for the substitution of plumbing fixtures covered by Emergency Alternate Federal Specifications, in lieu of plumbing fixtures, as specified.
On September 24, 1942, we submitted copies of letter by our supplier, the Ha joca Corporation, advising you of changes made necessary by W.P.B. restrictions. Under date of October 9, 1942, you requested proposals for certain items and made suggestions for other items. On October 31, 1942, our Mr. Aragona and Mr. Kay again visited your Washington Office for a conference with your Mr. Fahy and Mr. Elliott. At this conference it was decided that your Mr. Elliott make up a list of acceptable substitutes for those originally specified in compliance with all applicable provisions of the WPB limitation orders affecting fixtures. This list was submitted by you under date of November 10, 1942. Our proposal was submitted to you on December 2,1942, and your acceptance is dated December 10, 1942. On December 17, 1942, you requested further changes relative to fixtures. On December 28, 1942, we submitted a revised proposal covering the additional changes. Under date of January 26,1943, you accepted our revised proposal, making minor changes in the amount requested and under date of January 27, 1943, you issued formal Change Order increasing our contract by $302.14.
Begardless of the fact that we are to purposely eliminate the main reasons for delay in this application for time extension, such reason being the critical prevailing labor conditions which have existed in the Baltimore area, we would feel justified in requesting an extension of time of 180 days because of the conditions which would have been brought about by the three above mentioned Change Orders.
Had this Project been erected in normal times under normal conditions, the water lines and stacks would have been installed simultaneously with the construction of the concrete framing and this work would have been completed about a week or two after the completion of concrete. The brickwork and partitions would have been started prior to completion of concrete framing and could have been completed within six to eight weeks after the completion of concrete framing, thereby making ready for the interior trades to start work within that time. Inasmuch as our concrete framing was com *435 pleted during August, partitions would have been completely installed by October.
Because of these Change Orders, the plumber only began the installation of stacks and water lines at a time when this work should have been completed, during August, and was unable to make necessary tests before January, 1943. This delayed the installation of partitions and even after our Mason Subcontractor started on partitions in January, he was unable to properly proceed because the plumbing sub-contractor could not obtain definite roughing in dimensions from his supplier for the substitute fixtures and fittings. _ Partitions were consequently completed during April instead of October.
In view of the above and the fact that these changes were made necessary due to restrictions imposed by the War Production Board, we request that our contract time be extended 180 additional days, which will advance our completion date to October 16,1943, at which time we hope to be completed.
42. On July 30, 1943, the YA issued Change Order CCC, granting an extension of 180 days on account of Change Orders MM, UU, and XX, in the following terms:
With reference to your contract dated July 25, 1941, for construction of Hospital Building #225 at Veterans Administration Facility, Fort Howard, Maryland, you are informed that upon further consideration of the following indicated changes thereunder:
Performing the work contemplated by Change Orders “MM”, “TJU”, and “XX”, dated September 22, 1942, December 28, 1942, and January 27, 1943, respectively, in accordance with your respective proposals,
additional time of one hundred eighty (180) calendar days is hereby granted, in accordance with Article 3 of the general provisions of the contract. The change in contract price has heretofore been covered by the change orders referred to.
The plaintiff made no claim within 10 days for an adjustment of price because of this change order.
43. On January 20, 1944, the YA advised the plaintiff of its determination that the substantial date of completion of the contract was November 19,1943 (34 days beyond October 16, 1943, the extended date for completion of the contract *436 established by the extensions previously granted) and, in essence, invited a request for additional extensions, in the following statement:
*****
If you intend to make a further claim for delay, it is desired that your request for a time extension be submitted as early as possible. This request should be specific as to delays, based on verifiable data, such as time required for the completion of work under change orders or due to other causes allowable under the contract. The request should state the cause of delay, date the delay started and ended, the part of the work affected by the delay, and the effect of the delay on the completion of the contract as a whole.
It is desired that any further request for a time extension be submitted immediately, in order that action may be initiated toward final settlement of this contract.
44.In response, on January 28,1944, plaintiff requested an extension of 34 days on account of:
Change Order, dated J anuary 3,1944, for additional plaster on exterior walls-12 Days
Change Order, dated J anuary 14,1944, for additional plumbing- 2 Days
Change Order, dated J anuary 21,1944, for substitution of protected metal in lieu of copper- 20 Days
Total _34 Days
45. On January 28, 1944, the YA issued Change Orders 000 and PPP, granting extensions of 15 days and 19 days (a total equivalent to the 34 days requested by the plaintiff) and increasing the contract price by a total of $3,027.30.
Plaintiff made no claim, within 10 days, for a further price adjustment because of these change orders.
46. (a) In summary of the immediately foregoing findings, the Director of Construction of the VA (who was the Contracting Officer) found that the plaintiff had suffered a delay of 130 days due to priority ratings covering the period August 22, 1941, when the work was to begin, to December 20, 1941, when the priority rating was issued, and, in addition, delays totaling 299 days due to change orders — an aggregate total of 429 days over and above the contract time *437 of 400 days originally specified. The Director made no finding that any delay was due to the fault of either the plaintiff or its subcontractors or of the defendant.
(b) As a result of the extensions granted, the extended time for performance of the contract was commensurate with the time actually expended in its performance and no liquidated damages were assessed against the plaintiff on account of delays.
(c) The contract was completed and the hospital building was turned over to the YA on November 19,1943. The YA accepted the building and has been using it as a Veterans Administration hospital since that date.
47. On December 3, 1941, plaintiff entered into a second contract (VAc-1199) with the YA (hereafter called “the second contract”) for other work near the hospital building at Fort Howard, for a contract price of $6,990. On February 24, 1942, plaintiff received $6,970.80 on this contract. The income and costs of the second contract (VAo-1199) were intermingled on plaintiff’s books with the income and costs of the contract (VAc-1185) and it is impossible to determine from the books the exact amount of the costs of the second contract. It appears that these costs were approximately equal to the income received for performing the second contract. As a consequence, the income plaintiff received and the costs it incurred on the contract were $6,970.80 less than the income and costs shown on plaintiff’s books as applicable to the contract.
48. For the years 1941-43, plaintiff realized on the contract the following profits (and losses) before overhead:
1941 $18, 594. 37
1942 _ 18, 070.40
1943 _ (23, 888.70)
49.During each of the years 1941,1942, and 1943, plaintiff derived income and incurred direct costs and overhead in connection with other contracts in addition to the contract in issue here. The income and direct costs of the various contracts, including the contract in issue in this case, are segregated on the plaintiff’s books, with the exception of the commingling of the income and costs on the “second contract” referred to in finding 47.
*438 50.Plaintiff did not apportion its overhead among the different contracts during the contract period. In support of its claim here, it proposes, as a reasonable method of allocating overhead to its various contracts, a ratio of direct cost on each contract to the total direct cost on all contracts. On this basis, the overhead attributable to the contract is as follows:
1941 _$19,001.22
1942 _ 29,406.05
1943 _ 32,396.83
Total_ $80,804.10
51.Plaintiff’s claimed loss of $68,028.03 on the contract is computed as follows:
1841 1942 1943 Total
Net profit (or loss) before overhead_ $18,594.37 $18,070.40 ($23,888.70) $12,776.07
Overhead_ 19, 001. 22 29,406. 05 32, 396. 83 80, 804.10
Total losses, Including overhead _( $406. 85) ($11, 335. 65) ($56, 285. 53) ($68, 028. 03)
52. Plaintiff took various steps to diminish its costs during performance of the contract. These included voluntary reduction by Auf der Heide, its president, of his salary from $10,000, which he received in 1941, to $4,990 in 1942, and to nothing in 1943, and his utilization of an apartment in Baltimore instead of a hotel when it was necessary for him to be in Baltimore in connection with the contract.
53. (a) The evidence shows that plaintiff’s costs and overhead exceeded the estimates on which its bid was based and that it lost money on the contract. It is a reasonable inference from the evidence that some part of the plaintiff’s additional expense and overhead resulted from change orders caused by priority regulations but that not all of it did.
(b) The record contains evidence which indicates that factors other than change orders induced by priority regulations contributed to the delays encountered and to the costs plaintiff incurred in performing the contract in excess of the estimated costs on which its bid was based. The evidence does not relate specific dollar amounts of plaintiff’s expense or overhead, either to work required by particular change orders or to delays specifically identified as attributable to *439 particular change orders. Thus, on the evidence presented, it is impossible to distinguish the amount of expenses or overhead incurred as a result of the change orders from the amount of expenses or overhead attributable to other factors, or to determine, with even approximate certainty, what part of the total expenses and overhead would not have occurred, except for the changes induced by priority regulations.
(c) Accordingly, the evidence affords no adequate basis for finding that all of the delays that occurred, or all of the costs, including overhead, plaintiff incurred in excess of the estimated costs on which its bid was based, are fairly attributable to change orders induced by priority requirements. Nor does the evidence afford an adequate basis for identifying, even approximately, a specific portion of the excess costs or overhead as that which might fairly be found to be the amount attributable to such change orders.
THE CLAIM OF BANDLE-KAY
54. During the period from August 19,1941, to December 31,1952, and prior thereto, Joseph E. Bandle and C. Bobert Klueppelberg were copartners in the plumbing and heating business under the firm name of Bandle-Kay Company. On December 31,1952, the partnership was dissolved. Its business has been continued since then by Joseph E. Bandle as sole proprietor under the trade name of Bandle-Kay Company, subject to an agreement that any rights of the partnership in the claim asserted here are retained by Joseph E. Bandle and E. Bobert Klueppelberg in equal shares.
55. Plaintiff entered into a contract with the Bandle-Kay Company on the 19th day of August, 1941, in which the partnership agreed to furnish all labor, plant, equipment, and materials necessary to complete the installation of plumbing work under the contract for $54,000. The bid for this subcontract was based on the contract time of 400 days.
56. Normally, the first plumbing work to be done is the setting of sleeves in the concrete floors where pipes pass through. Bandle-Kay’s first work was performed in October 1941, by sending its foreman to Fort Howard. Before installation of pipe can begin, there must be at least two floor slabs above the plumbers’ heads so they can work in safety. *440 On this job, for reasons apparent from preceding findings, the first floor slab was not poured until April 8, 1942, 229 days after the notice to proceed was given; and the second floor slab was not poured until April 30,1942, 251 days after the notice to proceed was given. Randle-Kay started the installation of pipe in May 1942.
57. Randle-Kay had from one to three rnen on the job after October 1941 until May 1942 and thereafter had from two to fifteen men on the job, including plumbers, helpers, and painters. Due to labor conditions and union demands, helpers were given plumbers’ cards at higher wages. There were two wage increases during the progress of the work. Plumbers began at $11, and were given increases, first to $12 and later to $13.20 per day. Helpers began at $6 and were increased to $8 per day. Labor costs on some substituted materials were greater than on specified materials. Randle-Kay knew that a pre-existing plumbers’ labor contract was to expire in August 1941 and that higher wages were a possibility.
58. The work on Randle-Kay’s subcontract was affected by 12 of the change orders. Nine of these substituted other materials for specified materials. Seven were included among the change orders on which the VA granted an extension of time of 85 days, and an extension of time of 180 days was granted on others that affected Randle-Kay.
59. The principal change orders affecting Randle-Kay which caused delays were the following:
(a) Change Order MM substituted galvanized wrought iron pipe and galvanized fittings in place of copper tubing for all hot and cold water piping throughout the building. This change order caused a long delay, partly because each type of piping had to be determined before actual installation could begin.
On Change Order MM, the defendant had asked for proposals on November 17, 1941, January 7, and February 11, 1942. The first proposal was submitted on February 16, 1942, and was rejected on March 24, 1942, because of further priority orders. Another proposal was submitted on June 15,1942.
*441 (b) Change Order UU changed all vertical soil, waste, and vent piping on stacks, waste stacks, and vents from galvanized steel to cast iron pipe. This delayed the work because cast iron pipe is in shorter pieces and requires more labor to install than regular pipe.
On Change Order UU, the defendant notified the plaintiff of the need for this substitution on December 20, 1941, and again on January 13 and February 18, 1942. After a first proposal was rejected on March 24, 1942, Kandle-Kay forwarded another proposal to the plaintiff on April 16, 1942. Plaintiff submitted this proposal to the defendant June 15, 1942. Notice to proceed on this change was given on July 25,1942.
(c) Change Order XX changed all types of plumbing fixtures, where restrictive orders applied, to agree to federal specifications, which had been formulated to meet restrictive order requirements. This caused delays in procuring a final list of fixtures to be installed.
Plaintiff was told of the need for the substitution on December 20, 1941. It did not forward a proposal to the defendant until December 2, 1942, nearly a year later. This proposal was accepted by the defendant on December 10, 1942. An error was discovered in the proposal and this was finally resolved by January 26,1943, after submission of another incorrect proposal
(d) Change Order GGG substituted enamel iron tubs for tubs specified. It took a long time to find the substitute tubs. It was necessary to find a source of supply so that when Kandle-Kay gave plaintiff a quotation there would be no question about the substitute tubs being available.
Defendant made three requests for proposals for changes on these items before receiving one.
60. On some of the change orders, where the compensation to Kandle-Kay was increased, it appears to have been allowed 10 percent as overhead and 10 percent as profit on the change. When the change orders resulted in decreases, no deduction was made to reduce Kandle-Kay’s profit or overhead on its subcontract. Claims for additional compensation were never filed under the terms of the contract because of any of these change orders.
*442 61. It took more than twice as long to perform the work than the 400 days on which Randle-Kay’s bid was based. The exclusion of specified materials and the substitution therefor of other materials, the necessity of Randle-Kay’s finding suitable substitute materials, the difficulties and delays encountered in finding them, and extra time required to perform the work with substitute materials, all contributed to this delay. Sometimes substitutes were found, only to have them taken over by some other contract with a higher priority rating. Generally, substitutes could not be found by telephoning. It was necessary to go out and find them. Conferences with suppliers, plaintiff, and the VA also were required. Randle-Kay always attempted to have a stockpile of necessary materials on hand so as to avoid delays. They did have a stockpile of copper water piping and a lot of steel piping at Fort Howard, but, due to the restrictions, it became necessary to send these pipes back, and reorder substitute materials. The restrictions on the use of metals by the priority rating of December 20,1941, adversely affected Ran-dle-Kay especially, as most plumbers’ materials are metal, which the priority rating' either limited or eliminated altogether.
62. Randle-Kay filed a claim with plaintiff which plaintiff has not paid.
63. Randle-Kay kept books on a completed contract basis, which resulted in showing its loss on the contract as a loss sustained in 1943, when the contract was completed. The loss sustained was $18,692.08, exclusive of overhead, computed as follows:
Costs:
Materials_$11,597. 96
Tools_ 147.70
Labor_ 45,777.12
Subcontractors Pipe Covering- 3,930. 68
Insurance & P/R Tax- 2,516.22
Equipment- 12,779.24
Miscellaneous- 1, 565.44
$78, 314. 36
59, 622. 28 Income from Contract-
NET LOSS (BEFORE OVERHEAD) $18, 692. 08
*443 64. No overhead is included in the loss of $18,692.08. A reasonable amount of overhead is 6 percent on labor and material costs, computed as follows:
Total labor and material costs-$78, 314.36
Overhead at 6 percent_ 4,698. 86
65. The total loss sustained by Randle-Kay was $23,390.94, computed as follows:
Loss exclusive of overhead_$18, 692. 08
Overhead _ 4, 698. 86
Total loss_$23, 390.94
66. (a) As in the case of the plaintiff’s claim, the evidence shows that Randle-Kay’s costs and overhead exceeded the estimates on which its bid was based and that it lost money on the contract. The evidence also affords a basis for a reasonable inference that some part of Randle-Kay’s additional expense and overhead resulted from change orders caused by priority regulations but that not all of it did.
(b) The record contains evidence which indicates that factors, other than change orders induced by priority regulations, contributed to the delays that affected Randle-Kay’s work and to the additional costs Randle-Kay incurred in performing its contract, over and above the estimated costs on which its bid was based. The evidence does not relate specific amounts of Randle-Kay’s expense or overhead to the work required by particular change orders or to delays specifically identified as attributable to particular change orders. Thus, on the evidence presented, it is impossible to distinguish the amount of specific expenses or overhead Randle-Kay incurred as a result of the change orders from the amount of its expenses or overhead attributable to other factors, or to determine, with even approximate certainty, what part of the total of Randle-Kay’s expense and overhead would not have occurred, except for the changes induced by priority regulations.
(c) Accordingly, the evidence does not afford an adequate basis for finding that all of the delays that occurred in the performance of Randle-Kay’s part of the work, or all of the costs Randle-Kay incurred in excess of the estimated *444 costs on which its bid was based, are fairly attributable to change orders induced by priority regulations. Nor does the evidence afford an adequate basis for identifying, even approximately, a specific portion of Eandle-Kay’s excess costs or overhead as that which might fairly be found to be the amount attributable to such change orders.
CONCLUSION 0E LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.

 The Act of June 28, 1940, 54 Stat. 676, provided the the President might order that Navy and Army contracts or orders should have priority over other contracts. This statute was amended by the Act of May 81, 1941, 65 Stat. 286, to provide that the President might order that any contract,’ order or subcontract he deemed appropriate or necessary for the national defense should have priority over all other contracts or orders, and that the President might allocate material in such manner and to such extent as he deemed necessary or appropriate in the public interest and to promote the national defense. By Executive Order No. 8629, dated January 7, 1941, 6 P.R. 191, the President delegated his authority under these enactments to the Office of Production Management.

 Article 3 of the contract provided, in pertinent part:
“Article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. * * * Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered. Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.”

 Article 15 of the contract provided as follows :
“Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within SO days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.”

 Section 201 of the First War Powers Act, '5S Stat. 838, 839 (1941), authorized the President to promulgate regulations under which the executive departments could modify or amend contracts made during the war, either with or without consideration. The executive orders issued pursuant to this authority did not permit the Veterans’ Administration to modify contracts made prior to March 30, 1942, so as to effect price increases for which there was no liability under ordinary rules of law. See findings 24 and 25. Thereafter, Congress enacted the Lucas Act, 60 Stat. 902 (1946), which authorized the executive departments and agencies to consider, adjust, and settle equitable claims of contractors and subcontractors for losses incurred on Government contracts. But the statute by its terms applied only to contracts covered by executive orders issued under the authority of section 201 of the First War Powers Act. This contract did not come within its terms.

 Claims originally filed on behalf of other subcontractors were dismissed for lack of prosecution.

 “An Act to Expedite National Defense and for otter Purposes,” P.L. 671, 76th Cong., 3d Sess., 64 Stat. 676.

 P.L. 89, 77th Cong., 1st Sess., 56 Stat. 236.

 Executive Order No. 8629, dated January 7, 1941, 6 F.R. 191.

 Change orders for which no extension is requested, recited in the letter as written, are omitted from the quoted text.